UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

NATIONAL STAFFING SOLUTIONS,
INC., a Florida corporation,

    Plaintiff,

v.                                                   Case No. 6:23-cv-01542-CEM-LHP

ASCENDO REOURCES, LLC, et al.

    Defendants.
_____/

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS ASCENDO RESOURCES LLC AND STEVEN MEADOWS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, NATIONAL STAFFING SOLUTIONS, INC. ("National"), files this memorandum in opposition to the Motion for Summary Judgment ("Motion"), Doc. 138, filed by Defendants Ascendo Resources LLC ("Ascendo") and Steven Meadows ("Meadows").[1] Because disputes of material fact remain, summary judgment in favor of Defendants is improper.

## INTRODUCTION

This is straightforward case of corporate theft and interference. In 2018, Amy Costello ("Costello"), a former National employee, joined Ascendo in order to create a healthcare division that would compete with National. After attempting to

---

[1] National filed for dismissal of Counts IV and V and Defendants Jacylyn Atcachunas, Benjamin Benami, and Michael Foor. Doc. 154. The request for dismissal renders the motion for summary judgement on these counts and by such defendants moot. *Holers v. State Farm Mut. Auto Ins. Co.*, No. 6:08-cv-1260-Orl-19DAB, 2008 U.S. Dist. LEXIS 111163, at *2 (M.D. Fla. Aug. 7, 2008).

1

build a brand for years, Ascendo and Costello sought out and hired key former National employees, including Heidi Sanchez ("Sanchez").

Costello, then an officer of Ascendo, was aware that Sanchez, and others they were hiring, were subject to restrictive covenants and induced them to breach those covenants with the promise that they would make enough money that National would "eat shit." Ascendo through these hirings gained access to material information and forms used by National in the operation of its business. Meadows was instrumental in onboarding the stolen data Sanchez provided and implementing this data into Ascendo's digital operations.

While none of these facts are subject to credible dispute, and liability is therefore definitively proven, Ascendo and Meadows have moved for summary judgment. The Defendants' principal contention is that there is no evidence to either support National's claims or to permit a trier of fact to fully ascertain damages. In the first instance, this argument is disingenuous, at best.

There is no credible dispute that Meadows, at the direction of Ascendo's president Costello, established an entire domain in order to send email blasts customers, and that those emails were directed to clients of National. The fact that National has little evidence as to the full scope of Ascendo's conduct is because Ascendo and Meadows destroyed the domain used for these blasts. That spoliation is the subject of additional motion practice, and at the bare minimum summary judgment is not appropriate.

Moreover, the evidence adduced thus far, when taken in a light most

2

favorable to the non-moving party, clearly demonstrates Defendants' liability and therefore summary judgment in favor of the Defendants cannot be granted.

## DISCUSSION

"Summary judgment is appropriate only in circumstances where the evidence is such that a reasonable jury could not return a verdict for the nonmoving party." *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1134, 1138 (M.D. Fla. 2007) (cleaned up). The moving party bears the burden of showing that no genuine issue of material fact exists. *Id.*

The Court is required to draw all inferences in favor of the non-moving party and resolve all reasonable doubts against the moving party. *Id.* "All justifiable inferences are to be drawn in favor of the non-movant, and the evidence presented by the non-movant is to be believed by the court." *Id.*

**I. Ascendo and Meadows are Not Entitled to Summary Judgment Based on the Absence of Evidence They Lost and Destroyed.**

Defendants' common theme is that summary judgment should be granted in their favor because National lacks evidence to support its claim. However, as set forth in more detail in National's Motion for Spoliation Sanction, Docs. 124, 147, a large part of Ascendo's misconduct was conducted on a web domain that Defendants allowed to be destroyed. As this Court has recognized, the destruction of evidence leaves only a defendant's self-serving testimony on these issues, and therefore summary judgment is not appropriate. *Nuvasive, Inc. v. Absolute Med.*, No. 6:17-cv-2206-Orl-41GJK, 2021 WL 3008153, 2021 U.S. Dist. LEXIS 136873,

at *21 (M.D. Fla. May 4, 2021).

There is little credible dispute that spoliation occurred here. The evidence adduced thus far shows that Costello directed Meadows to set up a web domain, ascendohc.com, for use in Ascendo's healthcare business.[2] Doc. 147 at 4. Despite Ascendo and Meadows being under a duty to preserve this domain, it was deleted in June 2023. *Id.* at 6, 9-10.

Had these records been preserved they would have been highly relevant to whether Costello, among other things, aided or directed Sanchez to take, retain, share, or use documents and data Sanchez stole from National. These documents also would have revealed the full extent to which Meadows, Costello, or others at Ascendo received and used the documents stolen by Sanchez.

Beyond being relevant to issues of liability, these records would also bear on questions of damages. Defendants rely heavily on the supposed inadequate evidence of damages. It is of course difficult to quantify damages without knowing exactly how Ascendo profited from use of the stolen National documents and from business with National's customers. But simply because damages are difficult to quantify on the record as it stands does not mean they do not exist.

Taking all evidence, including the evidence of spoliation, in a light most favorable to National, the alleged lack of evidence supports denial of Defendants'

---

[2] It is beyond established that Costello's wrongdoing in her capacity as Ascendo's president is imputed to Ascendo. *See, e.g.*, *Seidman & Seidman v. Gee*, 625 So. 2d 1, 3 (Fla. 3d DCA 1992); *Zuckerman v. Smart Choice Auto. Grp., Inc.*, Case No. 6:99-cv-237-Orl-99A, 2000 U.S. Dist. LEXIS 14676, at *18 (M.D. Fla. May 18, 2000) ("The acts of a corporate officer that are intended to benefit a corporation to the detriment of outsiders are properly imputed to the corporation.").

4

motion for summary judgment. Taking the evidence in light most favorable to National, Costello, Meadows, and Ascendo destroyed key evidence, which calls into question the credibility of all testimony by Defendants, including the self-serving declarations submitted in support of their motion for summary judgment. Where the credibility of testimony is at issue, summary judgment is improper. *Furmanite*, 506 F. Supp. 2d, at 1138; *Patterson v. City of Melbourne*, 669 F. Supp. 3d 1204, 1224 (M.D. Fla. 2023); *R&M Mktg., Inc. v. Best Buy Auto of Tampa Bay, Inc.*, No. 8:16-cv-46-T-TBM, 2017 WL 2869541, 2017 U.S. Dist. LEXIS 106093, at *10 (M.D. Fla. Apr. 12, 2017).

Spoliation of evidence in this case creates an unavoidable dispute of material fact precluding summary judgment in favor of Defendants.

## II. Ascendo and Meadows are Not Entitled To Summary Judgment on Counts I and II for Tortious Interference.

Defendants do not dispute that the Noncompetition Agreements are valid contracts embodying business relationships between National and Sanchez and Benami, respectively. Rather, they argue that they were unaware of these agreements and did not induce their breach. These contentions are readily disposed of.

A. Ascendo and Meadows Had Knowledge of Sanchez's Noncompetition Agreement and Actively Procured its Breach.

Costello concedes she knew Sanchez's agreement existed.[3] Doc. 140 at 13.

---

[3] As with misconduct, Costello's knowledge as Ascendo's president is imputed to Ascendo. *See, e.g.*, F*ederated Life Ins. Co. v. Fifth Third Bank*, No. 2:14-cv-568-FtM-38CM, 2017 U.S. Dist. LEXIS 47807, at *15 (M.D. Fla. Jan. 31, 2017) (quoting *Beck v. Deloitte & Touche*, 144 F.3d 732, 736 (11th Cir. 1998)). The

5

The evidence, taken in a light most favorable to National, shows that Costello, in fact, had awareness of the terms of the Sanchez agreement. Costello spoke with a lawyer regarding the Sanchez agreement, and the lawyer advised Costello that the agreement made Sanchez's prospects of working at Ascendo "not good." Costello Dep. 283:25–284:3 (Doc. 134-4 at 23-24). Similarly, Meadows testified that he knew Costello and Sanchez were discussing the "attorney part of the equation" prior to Sanchez's hiring. Meadows Dep. 87:14-19 (Doc. 135-7 at 6).

Defendants cite no authority supporting their argument that a lack of awareness of the precise details of a Noncompetition Agreement means that they cannot tortiously interfere with that agreement. Regardless, in nearly the same breath where Costello told Sanchez of the attorney's advice, she also told Sanchez to disregard the Noncompetition Agreement and come work for Ascendo, where she would make enough money to make National "eat shit." Costello Dep. 291:10-14 (Doc. 134-4 at 25). Meadows then set up an email account for Sanchez to send email blasts to National's customers. *See* Doc. 147 at 5; Meadows Dep. 166:7-167:23, 169:1-3, 20-23, attached as Exhibit C.

Taking all facts in a light most favorable to National, Ascendo and Meadows were on notice that Sanchez working at Ascendo risked interfering with Sanchez's Noncompetition Agreement. Ascendo's president, Costello, unquestionably interfered with this agreement. Meadows aided Sanchez in soliciting National's

---

claim that Ascendo had no knowledge of Sanchez's Noncompetition Agreement is simply false given Costello's awareness of the matter.

clients in violation of her Noncompetition Agreement. Therefore, summary judgment must be denied.

B. <u>There Are Disputes of Fact Regarding Defendant's Knowledge of Benami's Noncompetition Agreement and Interference Therewith.</u>

Defendants next argue they were unaware of Benami's Noncompetition Agreement. Costello admitted to signing a restrictive covenant agreement with National. Costello Dep. Ex. 1 (Doc. 134-4 at 26-32). Costello also testified that she knew other National employees were subject to restrictive covenants. Costello Dep. 66:8-67:1, attached as Exhibit A. Costello's knowledge that National employees were generally subject to restrictive covenants is imputed to Ascendo.

Meadows, another former National employee, also signed a restrictive covenant as part of that employment. Meadows Dep. 52:3-6, Ex. 3, attached as Exhibit C. As Benami testified, it was common knowledge that National employees were required to sign restrictive covenants as part of employment, and Meadows likely would have known Benami had signed such an agreement. Benami Dep. 77:7-10, attached as Exhibit B.

Neither Ascendo nor Meadows can credibly argue they were totally unaware that Benami had a restrictive covenant agreement. Drawing all inferences in favor of National, both Meadows and Ascendo, through Costello, were aware of Benami's Noncompetition Agreement.

Meadows was friends with Benami and solicited him to come work at Ascendo. Benami Dep. 47:19-48:1, 48:24-49:3, attached as Exhibit B. Costello

7

participated in Benami's hiring process and later became his supervisor. Benami Dep. 28:19-29:25, attached as Exhibit B; Costello Dep. 144:13-18 (Doc. 134-4 at 16). As such, Costello and Ascendo knew that Benami's prior employer was National.

Moreover, Costello testified that her process in building a book of business as a staffing employee would focus on generating a large list of contacts in a CRM system and then conducting mass outreach to those contacts. Costello Dep. 263:25-264:9 (Doc. 134-4 at 17-18). Meadows testified that such mass outreach methods were common in the industry and that he established specialized domains to conduct such campaigns. Meadows Dep. 166:7-167:23, 169:1-3, 20-23, attached as Exhibit C.

Viewing these facts in a light most favorable to National, it is reasonable to infer that Ascendo and Meadows intended Benami to bring over contacts from his immediate past employer, National, and to conduct mass outreach to them to come work with Ascendo.

This conclusion is further bolstered by the mass poaching of former National employees by Ascendo after its independent efforts to develop a healthcare division bore little fruit. Taking these facts, and drawing all reasonable inferences, in a light most favorable to National, the evidence demonstrates that Defendants likely wanted National's former employees because they felt they could bring business from National over to Ascendo. As such, summary judgment in favor of Defendants on the question of interference is not appropriate.

C. <u>There is a Dispute of Fact Regarding Damages.</u>

Damages for tortious interference may comprise (1) the pecuniary loss of the benefits of the contract, (2) consequential losses from the interference, and (3) reputational harm tied to the interference. *SIG Sauer, Inc. v. D&M Holding Co., Ltd. Liab. Co.*, No. 8:21-cv-0194-KKM-SPF, 2022 U.S. Dist. LEXIS 26515, at *21 (M.D. Fla. Feb. 14, 2022).

Because damages are largely left to the sound judgment of the trier of fact, summary judgment on the basis that damages have not been proven with "exact pecuniary computation" is inappropriate. *Larweth v. Magellan Health*, No. 6:18-cv-823-Orl-41DCI, 2019 WL 11866499, 2019 U.S. Dist. LEXIS 237193, at *38 (M.D. Fla. Dec. 17, 2019).

Restrictive covenants themselves have value to a business because they prevent employees from leveraging relationships and knowledge built at the employer's expense for a rival business. More simply, these contractual restraints prevent a rival from starting on third base through stealing valuable relationships and data by hiring away employees of their competitors.

The interference with Benami's and Sanchez's Noncompetition Agreements was part of an effort to accelerate Ascendo's healthcare division, which had languished for years prior to the concerted poaching of National's employees. In other words, Ascendo wanted to get a leg up in the healthcare staffing world through National's work, not its own.

Because the value in the interference was in effect recreating National's

9

business in Ascendo's healthcare division, National asserted damages equal to the value of that business. Skepko Dep. 234:22-235:6 (Doc. 140-3 at 95-96). By inducing Benami and Sanchez to solicit National's business relationships, Ascendo benefitted by not having to incur its own expenses to develop these relationships.

Similarly, Ascendo avoided the expense of creating or otherwise acquiring data that it got through Benami and Sanchez handing it over in violation of confidentiality provisions in their Noncompetition Agreements. These are all pecuniary losses attributable to the interference with the Benami and Sanchez Noncompetition Agreements, and thus recoverable damages on the tortious interference claims.

Fixing damages with greater specificity is also complicated by Defendants' conduct. Ascendo has refused to produce documents concerning its revenues or profits, thus frustrating any attempt to calculate the actual value of consequential losses. Ascendo's corporate representative refused to testify on this topic (which was noticed for the deposition) without any claim of privilege. Holzer Dep. 312:5-12, 320:15-18, 321:11-19, 322:20-323:23, 324:4-15 (Doc. 145-1 at 9-15). And, as noted in Section I, documents that would have illustrated the extent of the business lost from Sanchez's breach of her Noncompetition Agreement are all gone, rendering a more precise calculation impossible.

The record indicates that National suffered compensable damages. The precise value of the benefit obtained by using National's employees to accelerate Ascendo's healthcare division remains a dispute of material fact and summary

10

judgment on this issue must be denied.

### III. Ascendo and Meadows are not Entitled to Summary Judgment on Count III for Trade Secret Misappropriation.

As an initial matter, a dispute of fact remains regarding the complete scope of Defendants' misappropriation. Sanchez downloaded tens of thousands of documents. Skepko Dep. 126:3-127:10, 130:22-131:9 (Doc. 134-1 at 19-22, 27-30). This included at least 35 client, customer, or healthcare provider lists. *See* Docs. 103-1, 106 at 3. Prior to Ascendo's destruction of critical evidence, National obtained documents clearly showing Sanchez provided at least two customer lists for a "mail merge" upload—importing a large number of emails to Ascendo systems to facilitate bulk solicitation emails. Skepko Dep. 133:18-21 (Doc. 140-3 at 50); *see also* Meadows Dep. Ex. 10, 27, 30, attached as Exhibit C. Meadows testified that he, at Costello's direction, set up the ascendohc.com domain specifically for purposes of sending these email blasts. Meadows Dep. 166:7-167:23, 169:1-3, 20-23, attached as Exhibit C.

The ascendohc.com domain is gone because Defendants, either through their action or inaction, destroyed it. However, again taking all facts and inferences in the light most favorable to National, it is beyond reasonable to find that the remaining 33 customer lists that Sanchez stole from National and delivered to Ascendo were used exactly the same way as the two lists for which evidence of misuse was not destroyed. Indeed, this use is entirely consistent with the blueprint for building a business at a new staffing company endorsed by Ascendo's president.

11

Costello Dep. 263:25-264:9 (Doc. 134-4 at 17-18). Because Defendants arguments are drawn to a mere two of these lists, a dispute of fact surrounding the remaining 33 lists precludes any judgment in favor of Defendants.

Defendants ignore the tens of thousands of documents and the hundreds of thousands of contacts that were stolen from National and delivered to Ascendo. Instead, Defendants assert that the two customer lists they address are publicly available or readily ascertainable. But National's corporate representative testified that various contact information, such as directors of nursing or therapy at target placement facilities, was not publicly known information. Skepko Dep. 154:24-155:4 (Doc. 140-3 at 60-61). He also testified that one was unlikely to acquire this information simply by cold calling the institution. Skepko Dep. 155:5-13 (Doc. 140-3 at 61).

This establishes a clear dispute of fact concerning whether such information is readily ascertainable, especially when considering National's lists pertained to a significant number of institutions within a broader network. It also confirms Costello's testimony about the value of having such information when starting a staffing business. Costello Dep. 263:25-264:9 (Doc. 134-4 at 17-18). If this information is so valuable, it follows that acquiring the information is difficult and time-consuming, not that such information can be readily gleamed by any interested party.

Generally arguments that alleged trade secret information is "available from other sources. . . are insufficient to demonstrate the absence of a genuine issue of

12

material fact." *Furmanite*, 506 F. Supp. 2d 1134, 1141 (M.D. Fla. 2007). Rather, whether information is a trade secret is a question of fact that should be reserved for the jury. *Id.* ("Courts are extremely hesitant to grant summary judgment regarding the fact-intensive questions of the existence of a trade secret or whether a plaintiff took reasonable steps to protect its trade secrets."). Defendants have not carried their burden to show a complete lack of dispute of material fact regarding the existence of a trade secret or misappropriation of the trade secrets. Summary judgment must be denied.

Defendants also argue that National has shown no damages resulting from the misappropriation. As discussed above, the advantage derived from the misappropriation was that Ascendo obtained for free information, documents, and customer relationships National incurred costs to assemble.

This advantage could be calculated in the form of profits obtained from use of the misappropriated documents. *See* Fla. Stat. § 688.004; *see also Sensormatic Elecs. Corp. v. Tag Co. US, LLC*, 632 F. Supp. 2d 1147, 1187 (S.D. Fla. 2008). However, National cannot quantify this value because Ascendo has, without justification, refused to testify on this topic. Holzer Dep. 312:5-12, 320:15-18, 321:11-19, 322:20-323:23, 324:4-15 (Doc. 145-1 at 9-15).

The advantage could also be quantified as the amount defendants would have had to pay to obtain or prepare the documents. National spent money to prepare the customer lists and other documents at issue. Alternatively still, the damages could be computed as National's year over year revenue loss after

13

Defendants' misconduct, amounting to tens of millions of dollars. *See, e.g.*, Doc. 137 at 2. As such, the remains a dispute of material fact regarding damages and summary judgment must be denied.

## CONCLUSION

Summary judgment in favor of any defendant is improper in this case because the spoliation of critical evidence leaves an inherent dispute of material facts. But even ignoring the spoliation, Ascendo and Meadows fail to show a complete absence of material fact on any of the claims on which they seek summary judgment. Rather, taking the evidence in the light most favorable to National shows that Ascendo and Meadows are liable on Counts I, II, and III. There remains a dispute of fact regarding the precise measure of damages, and thus summary judgment cannot be granted to Costello.

Dated: July 22, 2025.

s/ Scott A. Richards
**Scott A. Richards, Esq.**
Florida Bar No. 72657
Primary: srichards@losey.law
Secondary: docketing@losey.law
**Losey PLLC**
1420 Edgewater Dr.
Orlando, FL 32804
Telephone: (407) 906-7389
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document was filed with the Clerk of Court this 22nd day of June 2025, using the CM/ECF

system, which will send a notice of electronic filing to all counsel of record.

                                                **s/ Scott A. Richards**
                                                **Scott A. Richards, Esq.**
                                                Florida Bar No. 72657